Good morning, Your Honors. Eric Slepian on behalf of Tammy Sheridan. This is a case regarding social security disability benefits. My client suffers disability as a result of a number of impairments, and the Social Security Administration agrees that she suffers from severe migraine headaches, fibromyalgia, as well as depression. What's interesting in this case, Your Honors, is that there are eight medical sources that have assessed restrictions that would prevent Ms. Sheridan from sustaining an eight-hour workday. She has the opinion of a treating neurologist, the opinion of her treating rheumatologist. There are two primary care physicians, as well as a psychologist. They had Ms. Sheridan evaluated by one of their own psychologists as well, and that's Dr. General. And he noted that Ms. Sheridan had both physical and psychological problems, including the migraine headaches, and assessed restrictions that would not allow for a sustained eight-hour workday. In addition to those opinions, we have opinions from an occupational therapist, as well as a nurse, who indicated that the claimant would be unable to sustain an eight-hour workday. The administrative law judge basically tried to pick little pieces of the record to come around to say, I don't believe that doctor, I don't believe that doctor, I don't believe that doctor. Well, what the ALJ seems to have done is to go through each one of these things and say that, well, the symptoms are real in some sense, that they're not as severe as your symptoms, and that there is some skepticism as to the diagnoses by her treating physicians, because, to say it in a general sense, because in large part they are basing it on her reports for symptoms. The ALJ then looks at her other activities and says the degree of impairment pain and so on that she reports is inconsistent with her reports of daily activities. How do you respond to that? Okay. So at this point you're talking about the ALJ's credibility analysis. Right. And what's interesting is in all the reports submitted by my client, she indicated that she can do more on a good day. She suffers from migraine headaches two to three times a week. When she gets a migraine headache, she's down for hours at a time. Didn't she say at one point that the migraine headaches were 90 percent under control? Yes. She did to one doctor and nine, and they changed her medication, and she had a good response to this change of medication, but it didn't last. Nine days later she's in the hospital for a migraine headache, and she's, they restart her on all the old medications, and if you look at the record, after that she never recovered. So what happened was she was a migraine headache sufferer, and, you know, the ALJ points out in the record she reported physical therapy was helping, Cymbalta was helping. All that's prior to the date that she actually stopped work and became disabled. So her impairments increased and increased. In February of 2008 when she stopped work, she was in the hospital, and then she got referred to neurology. Then she got referred She was in the hospital for that reason? For the migraine headaches, yes. And they told her to follow up with a neurologist. She went to Dr. Sliding, who had been treating her in the past as well, I believe. And then he ultimately referred her to a headache specialist, and that's a neurologist, I don't have his name at my fingertips, it's a long name, it begins with an N. And he did his evaluation and he determined that she meets the headache criteria. There's a good description of the headaches, how frequently it is. She also developed some What did the ALJ do with the migraine headaches? He simply, I mean, he didn't reject that evidence on the basis that there was no physical proof of it, did he? Because there wouldn't be. Right. Well, what the administrative law judge did was he found that Tammy suffers from severe migraine headaches, and he assessed no restrictions as a result. He doesn't talk about how frequently they occur, that she's down for days, that the medications aren't working. And then in the residual functional capacity assessment, there's no discussion as to does she need to rest when she gets a migraine headache? How often do they occur? So he finds it to be a severe impairment, which by definition means that it has more than a minimal effect on the ability to perform work-related activity, and then just went on and never said, hey, maybe these migraine headaches would stop her from being consistently at work. And that was the point we brought out with testimony from the vocational expert. We specifically asked how many days can she miss from work? Two days a month. What if she needs to rest and lie down? She can't work. What if we look at Dr. General's report, which is their doctor who talks about these headaches? She can't work. Well, the neurologist tells us how often and how severe these headaches are. Could she work? No. So, you know, it all comes together. The judge makes it like she said she was in bed 24-7, but she never did. The judge makes it sound like she said that she could take care of all her kids, make all the dinners, drive all the time. She didn't. What she said is, when I don't have these migraine headaches, I can do things. I can prepare a meal. I can do some household cleaning. But when I have these migraine headaches, I can't. I'm sensitive to light. I'm sensitive to noise. I need to go lie down. I need to rest. And according to the vocational expert, if this occurs even two times a month, she wouldn't be able to speak. And, you know, when you say she had improvement with physical therapy, but it's while she's working, while she's struggling to do this, that doesn't reflect negatively on her credibility. When you say she tells her neurologist she had some improvement, a 90% improvement because they were adjusting the medications, that doesn't show that she lacks credibility. You have to look at the progression of what happened here. She was in the hospital. She continued with the doctor. She failed Imitrex. She failed, I don't know, there must have been six or seven. And she developed new problems. Her fibromyalgia wasn't diagnosed till after. Her neurologist talks about her developing cervical radiculopathy. Her nerve conduction symptoms. So cervical radiculopathy is basically when you have a pinched nerve in the neck and you'll develop some pain or sometimes it's numbness and tingling that will travel. Once it starts to travel, that's what they mean by radiculopathy. It shows that there's some impingement. It can travel to a shoulder. It can travel to an elbow. It can go all the way down to the hands when you talk about the upper extremities. It travels in specific dermatomes, which don't include the lower back. I'm sorry, I did not hear you, Judge. The radiculopathy travels in specific dermatomes, which does not include the lower back if it's cervical. That's correct. Is there some problem with her finding radiculopathy from a cervical lesion in the thoracic and in the lumbar region? Well, so she had a couple of other problems. There are additional problems. The neurologist talks about the cervical radiculopathy. He notes that there's a thoracic disc herniation, but they never say that she has radiculopathy in the thoracic area. She just has pain there. Not associated with a cervical lesion. Correct. And it's a herniated disc. And the fact that there's no radiculopathy at that area just tells us that it's not impinging on the nerve. It could still be causing difficulty with the bones themselves. So you could have bone that rubs together that will cause some pretty significant pain, for example, in the facet joints, things like that. But you're not going to get radiculopathy if the nerve root's not involved. How do you deal with the observation that she was using a cane when nobody had prescribed it? So the physicians were aware that she was using a cane. And at one point, the rheumatologist even encouraged her to use a scooter because she was having these gait abnormalities. Did anybody prescribe a cane for her? They didn't prescribe it, Your Honor, but she got it on her own. And one of the things that I find troubling is that if an individual needs a cane and they go and get it on their own and they go to CVS and they pay $12, why is that any different than putting that bill through the what? $25. Why is that different than going through Medicare, waiting till you get approval, and having a prescription filled and paying the $40 co-pay or whatever it is? It's easier. It's simple. It's affordable. I don't know why there's this big expectation that people are going to, I need a cane, so give me a prescription instead of I need a cane, I'm going to walk into CVS and buy a cane. What the AOJ says is that on October 30th, 2009, it was noted a claimant was using a cane. There was no indication during that clinical assessment, however, of an abnormal gait or that the cane had been prescribed as medically necessary. Dr. Mitchell noted the claimant to be using a cane and ambulating very slowly. There had been no offer of proof of a prescribed assistive device or that the use of the cane had been determined to be medically necessary. The claimant's use of a cane, therefore, is given no weight with regard to her complaints of functional instability or pain. What he's saying is that he suspects that she's exaggerating her symptoms for secondary gain. Well, if you look at the neurology records, she had something called ataxia, blazia, something. It was a weird name, and I defined it in my brief. Ataxia is dizziness. Which is common in a Parkinson's-type disorder. But she didn't have that, but she had the loss of balance that went with it, and they were troubled. They were trying to figure out why does she walk with such a peculiar gait. And there was some indication that maybe it was somatoform, maybe it wasn't, but the fact was she was having balance difficulties. The neurologist noted she had balance difficulties, and he was aware she was using a cane, and didn't question it. Let me ask you a procedural question. As to any of the doctors which the ALJ discounted because of objective findings in documentation, can you tell me which of those you think were improperly discounted or insufficiently explained? Yes, I should have mentioned it earlier. I have three and a half minutes left. I'm going to try to reserve the last two. But first, Dr. Schlittling, he's the neurologist who was treating the headaches and talks about how bad they are and how severe they are. The administrative law judge simply says he didn't perform an objective evaluation, but it meets the headache criteria by the International Society. And then he said he relied too heavily on reported symptoms, but there's zero evidence of that. If you look at Regeneter, I don't have the site, it's in my brief, that's not a proper basis for rejecting a treating physician opinion. Anybody else? Well, sure. I mean, really, all of them. But Dr. Fairfax, who talks about the fibromyalgia, again, the administrative law judge just says, oh, there's not enough objective evidence. But he documented the tender points, and that's really the objective evidence that we expect. And if you read Beneke, that's what it says. That's sufficient objective data. Dr. Hogue, he was a primary care physician, he's been involved all the time, and the judge just says, oh, he just simply believed his patient. That's not the way it works. You have to look for differing clinical findings. And, you know, if you read Orne, you have... It's not enough to say he's relying solely on the symptoms of the patient. He has to point to some objective documented evidence in the records which contradicts the symptoms given by the patient. Correct. And you're saying that doesn't occur with the neurologists, with Dr. Fairfax and Dr. Hogue? Of others, but yes, those are the majority of the three. And lastly, what's really interesting is he gave greater weight to the opinion of Dr. General. And I read to the vocational expert those limitations of Dr. General, and Dr. General said, well, that would preclude Tammy from sustaining work. And the ALJ never addresses that. He just says, I'm giving it great weight, and I'm finding she can work. I'll reserve my last minute. Good morning, Your Honors. David Blower for the Commissioner of Social Security. This case comes down to Sheridan's credibility, ultimately. The ALJ believed that she had impairments that limited her ability to work. It was just a matter of how limited she really was. Well, to me, the most interesting part of this is the migraine headaches. I mean, the migraine headaches, presumably, when she doesn't have them, doesn't impair her ability to do anything. When she does have them, is there any question that it does impair her ability to work when she does have them? I don't believe that there's any question that they would limit her. Right. And then is there any question that she had them? No. I think the question is how frequently and how limiting they were. What did the ALJ say about it? Not hardly anything. I mean, the ALJ did note that Dr. Toffol, the neurologist, indicated that her headaches were 90 percent better. At what point? And then she was back in the hospital 10 days later. Is that right? She did go to the emergency room several times with migraine headaches, right? She did go to the emergency room on several occasions. That's correct, Your Honor. I will say that Dr. Toffol's report was in 2010, nearly more than two years after her alleged onset of disability. So it's not as if... So there's two years there, first of all. I mean, maybe by 2010, for a short time, it was controlled. I just don't think the ALJ really dealt with the headaches. I believe that his residual functional capacity limiting her to unskilled work with limitations... No, but that's not the problem with the headaches. The problem with the headaches, as I understand it, is that when she has them, she stays home and has to stay home. I mean, she's in the emergency room. She's not at work. And the question is, you know, what the record shows about how frequently that occurs and whether it would interfere with her working, even if it allows her to take care of a 2-year-old when she's not having the headache. So as Sheridan's counsel pointed out, the vocational expert said she could miss work up to two days a month and still maintain work. She did tell Dr. General that she had a headache once a month. That was in 2008, June, I believe, 2008. And she told Dr. Toffol that her headaches were 90% improved. So although the ALJ did not include a limitation to missing two days of work a month, I believe that... In 2010, she told her counselor that she has had several days of severe migraine headaches during which she was unable to get out of bed. So I guess this is why I believe that this comes down to her credibility, Your Honor, because there is no... Well, partly it doesn't come down to the fact that the ALJ sort of left out and didn't deal with and didn't really make any findings about how severe the headaches were and how often they occurred at relevant times. I mean, he noted this one time that she said it was 90% under control, which was two years after the onset, and was quickly, after that, debunked by the fact that she ends up in the emergency room. And other than that, he didn't say anything. That's correct, Your Honor. I believe, I mean, ultimately, there's nothing that can support limitations from headaches other than her subjective complaints. Well, okay, so, but isn't that always true? I mean, migraine headaches just don't count? No, I'm not saying that they don't count, but I'm saying in this case, the ALJ found Sheridan wasn't fully credible. But did he find that she was not credible with respect to the frequency with which the headaches occur? I understand that there are various points at which he says the symptoms are exaggerated and so on. But how about with respect to the frequency with which the headaches were occurring? I don't know that he specifically said he didn't find her credible in terms of the number of times, that specific finding. She also was taking all different kinds of medication. She was doing physical therapy. She agreed that sometimes it got better and sometimes it got worse. She seemed pretty credible on that issue. I mean, she kept, she was doing things. I mean, she was the primary caregiver for her grandchild. She also says that she has two or three headaches at the hearing. She says she has two or three headaches a week, which last for 48 hours on average.  She had these totally debilitating migraine headaches. And then she had other headaches, which were chronic and severe, but didn't completely knock her out. I mean, at the hearing, she testified that she had a headache all of the time and that two to three times a week she had migraine headaches, which caused light avoidance and sound avoidance, and they would last on average for two days. So the fact that she took care of her grandchild, by her own statements to her counselor, her children with whom she lived were not helpful. They expected her to take care of her. She cooked, she cleaned, she went to the grocery store. Those activities are inconsistent with this idea that she's having two or three headaches that are lasting two days at a time. And the ALJ reasonably considered those activities of daily living in addition to this evidence of exaggeration that the court pointed out earlier. There was a term that puzzled me, and maybe you can explain it. Somatotizing. Dr. Mitchell found that she was somatotizing. What does that mean? There's something called a somatoform disorder, which is a psychological condition that can result in physical manifestations. What does that tell us with respect to her credibility? Anything? In this case, there were suggestions that she might have a somatoform disorder, but none of her doctors attributed her limitations to a somatoform disorder, which I think is relevant. It's possible that someone does not have a physical impairment but does have pain, and that's the idea of a somatoform disorder. Just to be sure that I understand what you're saying and what this word in quotation marks meant when it was being used, somatoform disorder, as I understand it, is something that may be psychological in origin but has genuine physical manifestations. Yes, Your Honor. So if she's somatotizing, if they use the word that's in quotation marks, that doesn't mean that she has no physical symptoms. It means that the physical symptoms may be psychological in origin, but it doesn't mean malingering, nor does it mean exaggeration. No, that is correct. Somatotizing is not malingering. In this case, there are suggestions by various doctors that her symptoms might be the result of a somatoform disorder, but I am not aware of any diagnosis that she has a somatoform disorder. I think her providers were struggling to find out a cause of her reported symptoms. But ultimately, the ALJ offered numerous reasons for finding that Sheridan was not credible. So we should take that to mean that he didn't believe her, that she was having migraines as frequently as she said she was? Is that the inference we should be making? Yes, Your Honor. But he never said that. I do not believe he explicitly stated she was not having migraines as frequently as she stated. It's a long ALJ decision, and I'm not familiar exactly with every portion of it. To go back to something that Your Honors were asking, plaintiff Sheridan's counsel about the lack of objective medical evidence. Didn't she say that she doesn't drive? She said she doesn't drive. She's also said she does drive at various points. At one point, her doctor told her to not drive, and then she was released to driving. Right. And the doctor told her not to drive because of the migraine headaches, right? I believe she was, it was at one point prior to the alleged onset of disability, she had a seizure, and she was told not to drive, and then her neurologist... I thought she did drive, but then at the time of the hearing, she wasn't driving again. Yes, I think she said that she would... She got some corroboration of the fact that she had some problems. People don't usually make themselves so inconvenient unless they have an issue. I don't think there's any doubt in this case that Ms. Sheridan has impairments that limits her ability to work. The question is, how limited is she? And in this case, ultimately the only evidence of that is her subjective complaints, and the ALJ didn't believe them because she's taking care of children and engaging in other significant daily activities. She's alleging disability due to impairments, which don't exist for any other better term. She says she has damage to her brain stem, and she alleged disability in part due to that, but CT scans and MRI scans are normal. She says that she has nerve damage in her neck, but MRIs are normal, nerve conduction studies are normal. These reasons are good reasons for the ALJ to have not credited Ms. Sheridan's extreme complaints about what she can't do. What's the requirement of specificity that we impose upon the ALJ? If we have testimony from her that she is suffering not merely headaches, but debilitating headaches, migraine headaches, with sufficient frequency that would prevent her from working, do we require that the ALJ specifically address that and say he doesn't believe it? I think that it is sufficient if the ALJ identifies specific reasons to doubt her credibility in general. I don't believe the ALJ is required to go through and for every allegation say I believe it to this degree. In this case the ALJ generally doubts her. For instance, the fact that the ALJ believes she's exaggerating, that shades all of her testimony, not her testimony about her headaches as well as her pain, and how long she can sit and how long she can stand. It's a general credibility finding. I guess briefly I would address the doctor's opinion. Most of the doctor's opinions are based in part on impairments that don't lack an objective basis. Dr. Schlichting, the neurologist, the primary care physicians, they all claim that she is limited to a certain degree on radiculopathy and neuropathy. But as the ALJ points out in his decision, objective studies demonstrate she does not have that. There are normal cervical and lumbar MRIs. There are normal nerve conduction studies, tests, that test for neuropathy and radiculopathy. So the ALJ reasonably considered the objective medical evidence as undermining those doctors' opinions, and as a result found that they were based on Sheridan's subjective complaints, which the ALJ didn't believe. And then to address briefly Dr. General's opinion, which Sheridan mentioned at the end of his presentation. Dr. General is a psychologist, not a medical doctor. And so he had two opinions. One opinion was about her mental abilities. He administered a number of tests to her, which showed normal intelligence, normal memory, normal concentration, and said that she could perform simple, uncomplex tasks. Then he rendered a second opinion, which was based on her self-report of migraines to him, and said that it would be difficult for someone with a migraine to work because he said that in part because he said he was a migraine sufferer and could commiserate with her. The ALJ didn't need to credit that portion of the opinion, which was really not just outside of his specialty, but outside of his competency. He's not a medical doctor. He's a psychologist. And it's also based on her subjective complaints and his experience as a migraine sufferer, not his expertise. In short, unless the court has any other questions, the commissioner would just request that the court affirm the commissioner's decision because it's supported by substantial evidence and free of harmful legal error. Okay, thank you. Do you agree with counsel that a generalized finding of lack of credibility is sufficient for the ALJ to discount the reported frequency and intensity of the migraine headaches? Absolutely not. Do you have a case that tells us this? I do. And unfortunately, it was published after the briefing of this case, but it's Kim Brown-Hunter against Colvin. It was just decided a couple of months ago. I happen to be the attorney of record on that case as well. Could you give us the citation? Right now it's only a Westlaw citation. That's fine. You don't have to give it to us now, but just write it down. Okay. I will do that. And basically what that states is the ALJ must identify the specific limitations or complaints that he finds not credible and cite the specific evidence that shows it's not credible. And here there was no attempt to do that. And the other thing I definitely want to point out, and this is ---- Pardon me for interrupting you, but there is some evidence that migraines were not of the frequency nor intensity alleged or claimed by your client in the fact that she said that she had been having these migraines since 2005 and she didn't become disabled until 2008, so that she was able to work in her former work from 2005 to 2008. Is there some evidence that the migraines increased in frequency and duration and intensity after 2008? Very much so, Your Honor. First, the claimant's testimony indicated that she would lose a job, get another job, lose a job, get another job because of these headaches. But some she was able to hold on to for quite some time. But her onset date of disability is February of 2008, which coincides with the date she was in the hospital for her migraine headaches. And they gave her a pain cocktail. They reported how a lot of the medications they were trying were losing efficiency. And that's when they told her she needs that neurological workup. And that's where Dr. It was shortly after that, within months, Dr. Scheitling referred her to that headache specialist. And then it goes on. So this record does show that in February of 2008, there was a very significant worsening of her headache complaints. The other thing I did want to point out, because we keep talking about this toddler issue and taking care of a child, but that information is coming from Dr. Mitchell's report. And the claimant, her granddaughter was going to go to CPS. And she said, no, I don't want the granddaughter to go to CPS. She has three or four other near adult children living with her that are helping out, and the father. At the time, they subsequently split. But when Dr. Mitchell talks about it, this is the record. And it's at page 514. The patient is teetering on a breakdown. She's very depressed and frustrated with her family. She has two adult children and a high school child living with her and a toddler, as well as a brother and an ex-wife they have moved in. Her children expect her to do all the housework and essentially take care of them as if they were children. And then he talks a little bit about that. And he writes, patient now has legal custody of Kendra's daughter and is raising her. Patient is very ill most of the time and unable to get out of bed on a regular basis. So the family must take care of the baby often. Patient is a, quote, train wreck, exclamation point, end quote. She is unable to function most of the time. That's the record they're looking at. And what's the date of that? October 16, 2009. Okay. Okay, well, we've taken you over time. Thank both sides for your arguments. Thank you. The case Sheridan v. Colvin now submitted for decision. And you will provide us with a citation to the case? I was just handed the citation. Okay. We can dispose of it right now. What is it? 215 U.S. APP period. Slow down. Okay, 215. 215 U.S. APP period. Lexis 13560. And that's August of 2015. What is, you said U.S. and then ATT? Yeah, it's the Lexis citation is 13560. No, but what were the letters? U.S. APP period. APP. ATP. Okay. Adam Paul Paul. Say it again. Adam Paul Paul. I have a New York accent, so sometimes it gets difficult. Well, I still didn't understand. Is this the name of the case you're about to give me? The name of the case is Kim Brown Hunter, and that's hyphenated Brown Hunter, against Colvin, C-O-L-V-I-N. And is it a Ninth Circuit case? Yes. Okay, thank you. Thank you. So, yeah, don't worry about it in writing. You've taken care of it. I appreciate that. Thank you.
judges: Fletcher, Berzon, Bea